The **COTILLION CLUB, INC., a Michigan corporation; Associated Brokers, Inc., a Michigan corporation; James Del Rio and Wilbur Hughes, individually, and John S. Humphrey, individually and doing business as Humphrey Realty Company, on behalf of themselves and others similarly situated, Plaintiffs,**

v.

**DETROIT REAL ESTATE BOARD, a Michigan non-profit corporation; United Northwestern Realty Association, a Michigan non-profit corporation; and Michigan Real Estate Association, a Michigan non-profit corporation, jointly and severally, Defendants.**

Civ. A. No. 22058.

United States District Court
E. D. Michigan, S. D.

Jan. 24, 1964.

Richard Goodman and John Conyers, of Goodman, Crockett, Eden, Robb & Philo, Detroit, Mich., for plaintiffs.

Clark, Klein, Winter, Parsons & Prewitt, Detroit, Mich., Howard D. House, Detroit, Mich., Robert M. Myers, Ann Arbor, Mich., Everett R. Trebilcock, of Fraser, Trebilcock, Davis & Foster, Lansing, Mich., of counsel, for defendants.

## RULINGS ON MOTIONS TO DISMISS

ROTH, District Judge.

The plaintiffs bring this action on behalf of themselves and all other Negro real estate agents, brokers, and salesmen in the City of Detroit, and all other Negro prospective real estate purchasers in the Detroit Metropolitan Area.

The plaintiff Cotillion Club is alleged to be a membership non-profit corporation, existing, among other things, for the purpose of promoting civic betterment and civil rights of its members— all of whom are Negro professional and business men, who are prospective real estate purchasers and sellers in the Detroit Metropolitan Area.

Each of the individual plaintiffs is said to be an American Negro, a member of the Cotillion Club, and employed or engaged in business as a real estate salesman, or broker, and licensed by the State of Michigan.

The plaintiff Associated Brokers is a corporation engaged in the business of real estate brokering and having as its employees real estate salesmen and brokers, each of whom is a Negro.

The defendants are alleged to be incorporated membership associations composed of persons, firms, and corporations licensed by the State of Michigan to engage in the customary business of real estate brokers and salesmen in the Detroit Metropolitan Area.

The original complaint in this case was premised on the claim that the defendants conspired and combined, in violation of the Federal Anti-Trust Statutes, the Federal Trade Mark Laws, and the common law and statutes of the State of Michigan (MSA 28.31 et seq. [Comp.Laws Mich.1948, § 445.701]), to create and carry out restrictions and restraints of interstate trade and commerce in the purchase, sale, transfer, financing, and occupancy of real estate, including federally financed and insured real estate and house accommodations in the Detroit Metropolitan Area.

The amended complaint seeks relief in this Court upon the following bases:

"1. Jurisdiction of this action is conferred upon this Court by the Federal Anti-Trust Laws (15 U.S.C.A. Sections 15 and 26); the Federal Civil Rights Act (42 U.S.C.A. Sections 1981–1988); 28 U.S.C.A. 1343; and Rule 23(a) (3) of the Federal Rules of Civil Procedure."

The complaints of the plaintiffs, as advanced at oral argument, are the following:

1. That defendants "are combining and conspiring together to exclude the plaintiff Negro brokers from their associations, from participation in their associations"; that is, "from membership."

2. That the defendants "are conspiring and combining together to set aside or set up and establish and maintain racial zones within the City of Detroit, State of Michigan, to exclude Negro buyers from competing for the purchase of houses within those zones and, consequently, to raise and tend to raise the prices for housing within those exclusive zones."

3. That the defendants have used and misused their privileges under the Federal Trade Mark Act and under the Trade Name and Emblem Acts of the State of Michigan by using "their trade marks for the purpose of establishing and maintaining a division of the housing market and allocated sections, assigned sections, of the City of Detroit and the State of Michigan, as all White or all Negro and attempted to prevent Negro purchasers from purchasing in those areas."

4. The defendants "have acted under color of state law to deny potential Negro purchasers of homes, as represented by the plaintiff Cotillion Club, access to them in certain areas in the City of Detroit and State of Michigan, contrary to the terms of the Federal Civil Rights Act."

5. The defendants "have acted in concert, combined together to deny the plaintiff access to federal mortgage insurance contracts and funds covering housing in zones which have been racially set aside by the activity of the defendants."

The first question is whether the amended complaint states a cause of action under the Federal Anti-Trust Laws. Section 4 of the Clayton Act, 15 U.S.C. § 15, provides:

"Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee. Oct. 15, 1914, c. 323, § 4, 38 Stat. 731." 15 U.S.Code, § 15.

Section 1 of the Sherman Anti-Trust Act, 15 U.S.C. § 1, provides:

"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or

with foreign nations, is declared to be illegal * * *."

The allegations of the amended complaint are that some *members* of the defendants receive and transmit information and listings to and from other states; that some *members* of the defendants make and file applications, reports, and other documents for transmittal to Washington, D. C., or other out-of-state offices of various Federal Housing Agencies; and that some *members* of the defendants make investigations, appraisals and surveys of federally financed or insured Michigan real estate to be transmitted to other states. Nowhere do the plaintiffs make any allegations concerning the extent or substantiality of these activities; nor do the plaintiffs allege any interstate activities of the defendant associations, as distinguished from their members. Plaintiffs' allegations fail to relate the alleged interstate activities of the members of defendant associations to be alleged restraints complained of in paragraphs 17 and 18 of the amended complaint. Having recited these incidental mailings across state lines, the remainder of the amended complaint is devoted to alleged restraints which are completely local in their nature and effects.

■ Such incidental activities across state lines, by members of the defendants, do not establish the jurisdiction of this Court. The critical question is whether the alleged restraints are operative in interstate commerce, and not whether the defendants' members engage, in the overall conduct of their business, in incidental activities across state lines.

As said in Page v. Work, 9 Cir., 290 F.2d 323, 330; cert. den. 368 U.S. 875, 82 S.Ct. 121, 7 L.Ed.2d 76:

"The test of jurisdiction is not that the acts complained of affect a business engaged in interstate commerce, but that the conduct complained of affects the interstate commerce of such business."

See also United States v. Oregon State Medical Society, 343 U.S. 326, 72

S.Ct. 690, 96 L.Ed. 978; Elizabeth Hospital Inc. v. Richardson, 8 Cir., 269 F.2d 167.

■ It is well settled that the Sherman Act was not designed to reach alleged restraints which are local in nature and do not substantially affect interstate commerce. In the early case of Hopkins v. United States, 171 U.S. 578, 600, 19 S.Ct. 40, 48, 43 L.Ed. 290, 299 (1898), the Court said:

"The act of congress must have a reasonable construction or else there would scarcely be an agreement or contract among businessmen that could not be said to have, indirectly or remotely, some bearing upon interstate commerce, and possibly to restrain it. We have no idea that the act covers, or was intended to cover, such kinds of agreements."

*Hopkins* has been consistently followed by such United States Supreme Court cases as Industrial Association of San Francisco v. United States, 268 U.S. 64, 45 S.Ct. 403, 69 L.Ed. 849 (1925); Levering and Garriques Company v. Morrin, 289 U.S. 103, 107, 53 S.Ct. 549, 77 L.Ed. 1062, 1065 (1933); United States v. Yellow Cab Company, 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947); and lower court cases such as Foster & Kleiser Company v. Special Site Sign Co. (CCA–9, 1936), 85 F.2d 742; United States v. Starlite Drive-In (CCA–7, (1953), 204 F.2d 419; Lawson v. Woodmere, Inc., 217 F.2d 148 (CA 4, 1954); 123 F.Supp. 251.

The case of United States v. South-Eastern Underwriters Association, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440, is relied upon heavily by the plaintiffs as authority for their claim that the activities here alleged are commerce and subject to regulation under the Sherman Anti-Trust Act. But what that case held is that a transaction between an insurance company organized in one state and a policyholder of another was commerce between the states and subject to the provisions of the anti-trust laws. This was recognized by Congress, through the enactment of what is now Section 1012,

Title 15 U.S.C., which provides that the Sherman Act and other designated federal statutes regulating interstate commerce shall be applicable to the business of insurance. It appears to the Court that plaintiffs' reliance upon the *South-Eastern* case is misplaced. The activities here under scrutiny are not analogous to those involved in the typical insurance case. Here, except for incidentals, the activities are local and intrastate. And significantly, no case has been cited or found which holds that dealing in real estate is commerce among the states.

It is clear from the complaint in this case that the restraints alleged relate only to the purchase and sale of real estate in the Detroit Metropolitan Area. It is competition for the purchase and sale of this real estate which is assertedly injured by the alleged restraints. This is local commerce and the competition allegedly restrained and interfered with is local in nature. If one assumes these allegations to be true, they fail to allege facts showing that the restraints substantially burden interstate commerce.

The amended complaint in this case fails to set forth any facts showing a substantial effect upon interstate commerce. As in the *Elizabeth Hospital, Kleiser* and *Oregon Medical Association* cases, cited *supra*, an attempt has been made to rely upon certain incidental activities across state lines. This is an effort to utilize incidental minor activities, consisting of the transmission of information across state lines, as a jurisdictional foundation for a substantive charge of alleged federal anti-trust violations. The effort is strained and, in the Court's opinion, overreaching. The foundation is patently incapable of supporting such a structure.

A consideration of the facts alleged leads to the conclusion that the commerce involved in this case, the relevant market involved, is the sale of real estate in the Detroit Metropolitan Area. The members of the defendants are licensed to sell real estate only in the State of Michigan. The sales relate to real property which is entirely local. The transactions must be consummated and perfected entirely in accordance with Michigan law, and Michigan law alone.

It is alleged that the members of the defendants make and file applications, reports, and other documents in writing in connection with the development, sale, mortgaging, leasing, and financing of federally insured real estate within the State of Michigan. The nature of these applications, reports, and other documents does not appear. The effect which the alleged restraints have upon these "applications, reports, and other documents" does not appear, nor does the extent of any such effect appear. There is no relationship established between the alleged restraint and the incidental activities involving mailings across state lines.

The complexity of modern business leaves little room for contracts, or business transactions, which cannot be said in some degree to affect interstate commerce.

■ The effect on interstate commerce must be direct and not remote and must be the result of intent to restrain interstate commerce, or there must be substantial and actual restraint of interstate commerce; and any conspiracy which only indirectly or incidentally affects and restrains interstate commerce is not within the purview of this section.

An interesting anti-trust case is Peoples Savings Bank v. Stoddard, 359 Mich. 297, 102 N.W.2d 777, 83 A.L.R. 2d 344. In effect, Justice Edwards— now a member of the Circuit Court of Appeals for the Sixth Circuit—in his opinion in that case inferentially disposes of plaintiffs' contention here that this Court has jurisdiction of the alleged anti-trust violations charged in the complaint. The following excepts are significant:

"Michigan's anti-monopoly laws provide: 'That a trust is a combination of capital, skill or arts by 2 or more persons, firms, partnerships, corporations or associations of persons, or of

any 2 or more of them, for either, any or all of the following purposes:

'1. To create or carry out restrictions in trade or commerce;

\* \* \* \* \* \*

'5. \* \* \* Every such trust as is defined herein is declared to be unlawful, against public policy and void: \* \* \*' CL 1948 § 445.701 (Stat.Ann. § 28.31).

'All combinations of persons, co-partnerships, or corporations made and entered into for the purpose and with the intent of establishing and maintaining or of attempting to establish and maintain a monopoly of any trade, pursuit, avocation, profession, or business, are hereby declared to be against public policy and illegal and void.' CL 1948 § 445.762 (Stat.Ann. § 28.62)."

\* \* \* \* \* \*

"Michigan has long prohibited monopolies both under common law (Richardson v. Buhl, 77 Mich. 632, 43 N.W. 1102, 6 L.R.A. 457; Hunt v. Riverside, Co-Operative Club, supra, 140 Mich. 548, 104 N.W. 40, 44); and by statute (CL 1948 § 445.701 et seq. [Stat.Ann. § 28.31 et seq.]); Attorney General ex rel. James v. National Cash Register Co., supra, 182 Mich. 99, 148 N.W. 420; Mulliken v. Naph-Sol Refining Co., 302 Mich. 410, 4 N.W. 2d 707.

"Beginning in 1899, the common-law prohibition was translated into statutory form. Anti-monopoly statutes are an exercise of the police power of the State. German Alliance Ins. Co. v. Hale, 219 U.S. 307, 31 S.Ct. 246, 55 L.Ed. 229; Associated Merchants of Montana v. Ormesher, 107 Mont. 530, 86 P.2d 1031. While in many ways our Michigan statute parallels and augments the Clayton Sherman Acts, in no way does it conflict with them.

"Further, the monopolistic practice sought to be restrained in these cases is predominantly local in its effect. We recognize, of course, that all banking has some aspects of interstate commerce. But 90% of the depositors and of the transactions with which the plaintiff bank and the Port Huron branch of defendants' bank are concerned are purely local. The effect of removing general banking competition as to interest on deposits and bank charges on individual and commercial loans will be overwhelmingly local.

"The courts have repeatedly recognized the jurisdiction of the state to enforce its own anti-monopoly legislation in situations where the effect of the monopoly was primarily intrastate. Standard Oil Company of Kentucky v. State of Tennessee ex rel. Cates, 217 U.S. 413, 30 S.Ct. 543, 54 L.Ed. 817; State of Texas v. Standard Oil Co., 130 Tex. 313, 107 S.W.2d 550; State v. Racine Sattley Co., 63 Tex. Civ.App. 663, 134 S.W. 400.

"Finally, defendants argue that the Michigan anti-monopoly statute cannot be applied to them because of the overriding effect of the federal banking laws.

"We note that the victim of defendants' plan was a State bank, that the impact of the monopoly sought to be created would be overwhelmingly local, and that all of the parties with the single exception of the Michigan National Bank are State residents or institutions created under and governed by State law.

\* \* \* \* \* \*

"What is left for our consideration as to this question is whether or not the state courts of Michigan can enjoin a violation of state law committed by a Federally chartered bank."

If the conclusion of the Court in that case is correct (and we believe it to be) that the circumstances presented a case of "overwhelmingly local" impact or effect on commerce, then perforce the circumstances here claimed require the conclusion that we are dealing with a purely intrastate activity, except for minor incidentals.

Peoples Savings Bank v. Stoddard also ably demonstrates that the failure of the plaintiffs in this case to establish federal anti-trust jurisdiction does not leave them without a remedy.

The Court concludes that the allegations of the amended complaint do not make out a claim under the federal anti-trust statutes and law upon which relief could be granted.

Plaintiffs also seek to invoke the jurisdiction of this Court under 28 U.S.C.A. § 1343 (June 25, 1948, c. 646, 62 Stat. 932, as amended). This section confers jurisdiction in the District Courts for all civil actions resulting from violations of the Civil Rights Act, May 31, 1870, c. 114, 16 Stat. 144, being 42 U.S.C.A. Sections 1981 et seq.

Plaintiffs premise their claim under the Civil Rights Act provisions upon the following general allegation:

"19. During all of the times mentioned herein, each of the defendants and each of their respective members have been regularly engaged at their respective places of business and elsewhere within the State of Michigan and pursuant to authority conferred upon them by the State of Michigan, in the purchase, sale, development, and leasing, and in acts necessary to the purchase, sale, development, and leasing of real estate and housing accommodations in the Detroit Metropolitan Area financed in whole and/or in substantial part by federal funds and credits."

Plaintiffs would have the Court "sift facts and weigh circumstances to determine the involvement of the state in private conduct." But before we can do that, we must test the allegations of the complaint to ascertain whether its allegations state a claim upon which relief may be based.

The Federal Civil Rights Act, 42 U.S.C.A., Section 1983, provides:

"§ 1983. Civil action for deprivation of rights. Every person who, under color of any statute, ordinance, regulation, custom, or usage, or any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. R.S. § 1979."

The activity prohibited by the Federal Civil Rights Act must be state "activity." This proposition was forcefully stated in Miner v. Commerce Oil Refining Corporation, 198 F.Supp. 887, at page 891 (D.C., R.I.1961):

"The Civil Rights Act was originally enacted to enforce the Fourteenth Amendment. Monroe v. Pape, 1961, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492; William v. Yellow Cab Co. of Pittsburgh, Pa., 3 Cir., 1952, 200 F.2d 302, certiorari denied Dargan v. Yellow Cab. Co. of Pittsburgh, Pa., 346 U.S. 840, 74 S.Ct. 52, 98 L.Ed. 361. And it is equally well settled that the action inhibited by that Amendment is only such action as may fairly be said to be action of the States. Said Amendment erects no shield against private conduct, no matter how wrongful or discriminatory it may be. Collins v. Hardyman, 1951, 341 U.S. 651, 71 S.Ct. 937, 95 L.Ed. 1253; Shelley v. Kraemer, 1948, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161; Civil Rights Cases, 1883, 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835. In order that any action may be fairly said to be State action, such action must be taken by an agent or instrumentality of the State under authority of State law. Screws v. United States, 1945, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495; United States v. Classic, 1941, 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368; Ex parte State of Virginia, 1879, 100 U.S. 339, 25 L.Ed. 676."

■ It is plain from the above and from many other cases that to charge

a defendant with a violation of the Civil Rights Act, his conduct must be conduct of the state. 42 U.S.C.A. Sec. 1983, provides that conduct:

"* * * under color of any statute, ordinance, regulation, custom, or usage of any State or Territory * *."

which leads to a deprivation of rights under the Constitution is actionable. This provision implements the constitutional requirement that the action must be that of the state.

Shelley v. Kraemer, 334 U.S. 1, 13, 68 S.Ct. 836, 842, 92 L.Ed. 1161, 1180:

"Since the decision of this Court in the Civil Rights Cases, 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835 (1883), the principle has become firmly embedded in our constitutional law that the action inhibited by the first section of the Fourteenth Amendment is *only such action as may fairly be said to be that of the States.* That Amendment erects no shield against merely private conduct, however discriminatory or wrongful."

See also Collins v. Hardyman, 341 U.S. 651, 71 S.Ct. 937, 95 L.Ed. 1253.

The corporate defendants, Detroit Real Estate Board, United Northwestern Realty Association, and Michigan Real Estate Association, are corporations incorporated under the corporation laws of the State of Michigan. There is no claim that defendants are licensed in any way by the state other than by being incorporated in this state. All real estate agents and brokers and salesmen must obtain a license from the Michigan Corporation and Securities Commission (MSA, Sect. 19.791 [Comp.Laws Mich. 1948, § 451.201]). These corporate defendants are not required to obtain said license nor have they done so. Thus, the only claim that the corporate defendants were acting under color of state statute must result from the fact that they were incorporated pursuant to the laws of the State of Michigan.

One substantial weakness in plaintiffs' allegations of state action is demonstrated by Williams v. Hot Shoppes, Inc. (1961), 110 U.S.App.D.C. 358, 293 F.2d 835. The Court said at page 841:

"Under existing decisions, 'color of law' requires a vesting of *actual* authority of some kind. In Screws v. United States, 1945, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495, it was established that the unlawful acts of an individual might be imputed to the state (for purposes of applying the Fourteenth Amendment) if the state had done acts clothing the wrongdoer with the trappings of its sovereignty. A similar view is implicit in the recent pronouncement of the Supreme Court on the subject in Monroe v. Pape, supra. But where the state has done nothing of that sort, we fail to see how the acts of a wrongdoer, no matter how reasonable his mistake of law, may be imputed to the state."

In the case of Collins v. Hardyman, 341 U.S. 651, 71 S.Ct. 937, 95 L.Ed. 1253, the Court said:

"* * * 'The Fourteenth Amendment protects the individual against state action, not against wrongs done by individuals. * * *'

"It is apparent that, if this complaint meets the requirements of this Act, it raises constitutional problems of the first magnitude that, in the light of history, are not without difficulty. These would include issues as to congressional power under and apart from the Fourteenth Amendment, the reserved power of the States, the content of rights derived from national as distinguished from state citizenship, and the question of separability of the Act in its application to those two classes of rights. The latter question was long ago decided adversely to the plaintiffs. Baldwin v. Franks, 120 U.S. 678, 7 S.Ct. 656, 763, 32 L.Ed. 766."

In Hoffman v. Halden, 9 Cir., 268 F.2d 280, the Court set forth the ele-

ments of a cause of action under 42 U.S.C.A. 1985(2) as follows:

"It thus appears that under § 1985 (a), Title 42 U.S.C.A., the elements of a cause of action are (1) that defendants conspired; (2) that the purpose of the conspiracy was to impede or hinder, or obstruct or defeat the due course of justice in a state or territory; (3) with the purposeful intent to deny to a citizen the equal protection of the law (Snowden v. Hughes, supra [321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497]); and (4) that the acts complained of were done under color of state law or authority (Collins v. Hardyman, supra); (5) (the requirement of § 1985(3), Title 42 U.S.C.A.) that by acts done in furtherance of the conspiracy the plaintiff was injured in his person or property *or* was deprived of having and exercising a right or privilege of a citizen of the United States." (268 F.2d 280, at 292)

■ The various contacts the defendants have been alleged to have with governmental agencies, both state and federal, do not make them instrumentalities of government in the constitutional sense, or subject them to either the Fifth Amendment or the Fourteenth Amendment to the United States Constitution.

The defendants are private persons and corporations and not instrumentalities of government, either state or federal.

This action is one brought by individuals and associations seeking redress for the alleged .invasion of their civil rights by other individuals or private corporations, and the Court has no jurisdiction over the subject matter of the action. The abuses of which the plaintiffs complain arise out of private rights and rights conferred by state law.

The motions of the defendants to dismiss the complaint are granted.